UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED
98 JUN 29 PM 2:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

TOMMY BURK, SCOTT CARROLL, )
JACKIE JONES )
 )
    Plaintiffs, )
 )  CV-97-PT-1086-M
    vs. )
 )
CITY OF TALLADEGA, et al. )  ENTERED
 )  JUN 2 9 1998
    Defendants. )

MEMORANDUM OPINION

    Plaintiffs Tommy Burk, Scott Carroll, and Jackie Jones[1] have filed a complaint against the City of Talladega, Alabama ("City"), Mayor Charles E. Osborne ("Mayor"), Chief of Paramedics Tony Edwards ("Chief"), Keith Marshall ("Marshall"), David Self ("Self"), and Patrick Parton ("Parton") alleging retaliatory and discriminatory treatment in violation of the Fair Labor Standards Act ("FLSA") 29 U.S.C. §215(a)(3). Plaintiffs have also alleged a violation of the Settlement Agreement and Release arrived at in Jones v. City of Talladega in January, 1996. Part of the settlement was an agreement by the City not to violate §215(a)(3). Jones was a 1995 lawsuit involving the same three plaintiffs, alleging damages and unpaid wages under the FLSA.

---

    [1]The plaintiffs represent to the court that the claims of Jackie Jones should be dismissed from this suit.

1



Defendants City, Mayor, Chief, Marshall, Self and Parton have filed a motion for summary judgment asserting they are entitled to judgment as a matter of law.

## I. FACTUAL BACKGROUND[2]

The City employed plaintiffs Scott Carroll ("Carroll") and Tommy Burk ("Burk") as paramedics. Carroll was so employed from March 5, 1991 until his resignation on July 25, 1997. Burk began with the department on July 14, 1989 and resigned on March 18, 1997. In June, 1995, Carroll joined by Burk, Jones, and several other employees brought an action under the FLSA to recover unpaid wages and damages contemplated under the Act. The employees were complaining that the City did not pay them for overtime hours worked until they had worked more than 56 hours. Immediately after the suit was filed, the department modified its pay structure to pay overtime for each hour worked over forty per week. As part of the Settlement Agreement, the City paid the named plaintiffs back pay and other FLSA damages. Among those who were compensated through the Settlement Agreement were Patrick Parton, Bo Gortney, Jackie Jones, Michael Kaiser, Jeremy Thompson, Burk and Carroll. Keith Marshall, David Self and Ron Ligon were compensated through a separate settlement agreement.

---

[2] The "facts" are stated favorably to the plaintiffs and may or may not be the actual facts.

2

Burk and Carroll allege that they have been retaliated against for their participation in the Jones suit. Carroll suggests that evidence of this retaliation can be found in a collection of complaints he filed with his superiors since the first lawsuit was filed.[3] Each complaint, Carroll contends, demonstrates the unfair treatment he endured as a result of his plaintiff status in Jones. In September of 1996, he and Burk were required to take the majority of out of town transfers and all of the night calls. On October 10, 1996, Carroll, the most senior person, complained that he was not left in charge in the absence of the lieutenant. The policy, as Carroll understood it, was that the most senior person would be left in charge when the lieutenant was out. On November 8, 1996, a 911 call came in, and according to the system in place, was supposed to be handled by Lt. Self. It was Carroll's turn to sleep. Self refused to take the call. On November 13, 1996, Self refused to take an out of town trip when it was his turn. The Mayor and Chief had ordered that the employees were to rotate calls.

The Chief transferred Carroll to the B shift on November 26, 1996. For the second time in three months Carroll was being reassigned shifts. No one ever indicated to Carroll why he was being transferred. Carroll received a warning from Lt. Marshall

---

[3]The written complaints themselves would likely not be admissible at trial.

on December 4, 1996 stating that "it saddens me to know that with less than twenty four hours on this shift, controversy is already brewing...Mr. Carroll you are not currently in any position to tell me what you are or are not going to do as you attempted to do yesterday." Lt. Marshall gave Carroll an overall score of 4 out of 9 on a performance evaluation of January 28, 1997. Marshall's written comments included, "attitude is poor," "he constantly attempts to defy me by going outside the chain of command to the mayor," and "Mr. Carroll has had a hard time getting along during this rating period." Carroll's nonnumerical score was "unsatisfactory," the lowest possible choice.

On May 2, 1997 the Chief recommended Carroll be suspended without pay. Four days later, he recommended that Carroll be terminated from City service altogether. Carroll was not terminated at this time.

Lt. Parton issued Carroll a verbal reprimand for incorrectly filling out a patient care report. Although such employees are usually allowed to correct their mistakes, on this occasion the report went on to the Chief's office.

City policy forbids employees of the ambulance service from carrying a firearm while on duty. Carroll had filed a grievance

against Lt. Parton who had sold a firearm while on duty.  Parton never received a warning or reprimand.  On May 26, 1997, Carroll brought his gun, a Glock 40, to Talladega Police Officer Mark King for an "informal firearms demo/test."  At that time, the department was considering changing from a 9mm to the Glock 40.  Carroll gave the gun to King in front of City Hall.  Lt. Marshall issued a written reprimand to Carroll on May 29, 1997.

On July 25, 1997, Carroll resigned from his employment with the City citing the "continuing harassment and undue stress" as his reasons.

Burk states that the retaliation began even before the first lawsuit was filed.  The Chief allegedly threatened Burk stating, "that if we hired an attorney or anything...that we would be scrubbing the floors with toothbrushes, waxing the ambulances everyday and no more TV privileges."  The next day the paramedics were told to take all but four of their bunks out of the station house.

Burk inquired to Self on September 29, 1996 as to why he and Carroll had to take all of the out of town transfers.  They were also made to run out of town transfers on their nights to sleep.  Self answered the inquiry by saying that Burk was a "mental case"

and Carrol was too immature to stay in town. Self stated on one other occasion that Burk and Carroll could not be left in town because Burk was "under psychiatric care" and Carroll was "too immature."

On October 2, 1996, Burk found the recliners that he and Carroll used to sleep were wired to prevent them from reclining. The supervisors knew this was how they slept because they had to run every night and could not even take their boots off. Burk wrote two memos to Mayor Osborne referring to the unfairness of the out of town transfer situation as well as having to run calls every night, and the constant harassment. He cited the increased stress, harassment, threats, and mental anguish that he had suffered since the first lawsuit. In March of 1998, Burk ceased his employment with the City, on the advice of his physician.

## II. PARTIES' CONTENTIONS

### A. Defendants' Contentions.

The individual defendants contend that they are entitled to judgment as a matter of law. They are not employers as defined by the FLSA. All defendants contend that there is no cause of action for retaliation as plaintiffs did not suffer an adverse employment action. Further, that plaintiffs' involvement in a prior lawsuit was not the "but for cause" of any alleged adverse

6

employment action.

First, the individual defendants contend that they are not employers as defined by the FLSA. 29 U.S.C.A. §203(d)  Section 203 (d) defines an **employer** as "any person acting directly or indirectly in the interest of an employer in relation to an employee..." Defendants argue that the City of Talladega and only the City is the employer of the plaintiffs. The paramedic department is located on the premises of the City. Decisions regarding wages and benefits for City employees are made by the City Council. No City employee may be promoted or terminated without the Civil Service Board's approval.

According to the defendants, Mayor Osborne does not have the power to control the amount, method or rate of pay for employees of the paramedic department. Nor does he have the authority to promote or terminate any city employee without the Civil Service Board's approval. Chief Edwards does not have the power to hire and fire. Nor does he have control over employee pay.

Second, defendants contend that, as a matter of law, they cannot be found liable for retaliation because the plaintiffs have not offered sufficient evidence to show an adverse employment action. Plaintiffs' job status never changed

following the prior lawsuit. They were never demoted nor had their pay or benefits cut. The new pay scale implemented as a result of the settlement actually increased their wages. Plaintiffs' hours remained 24 hour shifts. Both Burk and Carroll voluntarily resigned from their employment with the City.[4]

Finally, plaintiffs are unable to meet the final prong of a prima facie discharge case, causation. Defendants contend that plaintiffs offer no evidence that the alleged employment action(s) were caused by their claims in the prior lawsuit under the FLSA. They argue, first, that none of the other plaintiffs from the first lawsuit, as Burk stated at deposition, were subject to retaliatory harassment or discrimination. Second, substantial time had elapsed between plaintiffs' complaints of retaliation and their initial institution of FLSA proceedings. There were virtually no complaints of retaliation between the filing of Jones in June, 1995 and the Fall of 1996. Finally, plaintiffs themselves attribute the alleged retaliation to factors other than their FLSA claims. Burk testified that he and Carroll were the only ones discriminated against because it was a "personal matter." Burk pointed to the fact that he was a single

---

[4]Burk alleges that he was constructively discharged but defendants maintain that he has offered no evidence to demonstrate that his working conditions were so intolerable that a reasonable person in his position would be compelled to resign. See Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752, 754 (11th Cir. 1996).

8

foster parent, was not well-liked and suffered from a medical condition as reasons for the alleged discrimination.

**B. Plaintiffs' Contentions.**

Plaintiffs contend that summary judgment is not appropriate. They argue that the individual defendants are employers under the FLSA. Burk and Carroll assert that they have proffered sufficient evidence to establish a prima facie case of retaliation. There is evidence of adverse employment actions as well as a causal relation between the actions and the filing of the first lawsuit.

The Mayor, Chief and Lieutenants, according to the plaintiffs, are all considered "employers" by Eleventh Circuit precedent interpreting the FLSA. The lieutenants exert much control over the paramedics. They ensure adherence to operating procedures, make day to day decisions, fill out weekly and yearly time sheets, daily report sheets, call log books, vacation requests, swap time requests, employee evaluations, statistic sheets, and clothing issue forms and decide who takes out of town transfers. The Chief is ultimately responsible for all disciplinary actions. He is responsible for any problems between a medic and his lieutenant. Outside employment and employee overtime must be approved by the chief or shift supervisor. The

9

Mayor has the "final say" on the issues and problems with which the Chief and lieutenants deal. He may either override or follow their initiatives.

Plaintiffs argue that they suffered from several adverse employment actions. Burk and Carroll received numerous threats and reprimands since they became involved in Jones. The Chief threatened them with floor cleaning and ambulance waxing if they hired an attorney. At the same time they were forced to take all but four bunks out of the station. Moreover, plaintiffs contend that they were subjected to reprimands for incidents for which other paramedics were not reprimanded.

Their working conditions finally became so intolerable finally so as to result in their constructive discharge. Burk and Carroll point to tremendous pressure and harassment from their employers, and being forced to take back to back calls, often with unlicensed drivers, while other medics were allowed to sleep. Their recliners were wired up so as to prevent reclining, the method the men used to sleep.

The causal connection, plaintiffs argue, is evinced by the fact that they had so many complaints about their working conditions starting at the same time the first suit was

initiated. Carroll and Burk insist that most of the harassment and discrimination against the plaintiffs resulted from their being singled out for their participation in Jones. They were the targets of a retaliatory campaign designed to force them to resign from the City.

### III. COURT'S ANALYSIS

**A. Employers**

The City of Talladega is certainly an employer of the plaintiffs. Whether the Mayor, Chief and the lieutenants are plaintiffs' "employers," under the FLSA, depends on the "total employment situation." Welch v. Laney, 57 F.3d 1004, 1011 (11th Cir. 1995) (citing Wirtz v. Lone Star Steel Co., 405 F.2d 668, 669-70 (5th Cir. 1968)) The factors the court must consider include: 1) whether or not the employment took place on the premises of the alleged employer; 2) how much control did the alleged employer exert on the employees; and 3) did the alleged employer have the power to fire, hire or modify the employment condition of the employees. Id.

The court concludes that none of the named individuals in this case were the plaintiffs' "employers." None of the individuals satisfy the criteria set out in Welch. Further, it is doubtful whether a mere supervisor can even be considered an

11

"employer." Such persons are co-employees. The language in the statute which defines employer is likely intended to address a situation as was considered in Wirtz involving joint employers, independent contractors, etc. All supervisors act "in the interest of an employer in relation to an employee." The statute obviously does not intend to make all supervisors "employers." A overly broad reading of the statute could envelop a mere clerk in the personnel department who acts "in the interest of an employer in relation to an employee." The claims against the individual defendants will be dismissed.

B. Retaliation

    1. Adverse Employment Action.

The parties agree that an employee must show "some employment injury," in order to maintain a retaliation claim. Adverse employment action includes discharge, demotions, refusals to hire, refusals to promote and reprimands. Rogers v. Miller, 57 F.3d 986, 992 (11th Cir. 1995); McCabe v. Sharrett, 12 F.3d 1558, 1563 (11th Cir. 1994). An action is not adverse merely because the employee dislikes it or disagrees with it. Perryman v. West, 949 F.Supp. 815, 819 (M.D. Ala. 1996). Not everything that makes an employee unhappy is an actionable adverse action. Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996). As the Seventh Circuit pointed out in Rabinovitz v. Pena, 89 F.3d 482,

488 (7th Cir. 1996), to be actionable, the adverse employment action must be "material." The change in terms and conditions of employment must be more disruptive than mere inconvenience or alteration of job responsibilities. Id. Making one's life at work more difficult or strenuous does not necessarily amount to actionable adverse employment action.

It is undisputed that plaintiffs were not discharged or demoted, did not suffer pay or benefits reduction, nor were they avoided for promotion. Plaintiffs claim that they were given bad job assignments, reprimanded, threatened and constructively discharged and that these are the actions that evince retaliation. First, the Chief threatened to have them cleaning floors with toothbrushes and waxing ambulances and to restrict TV privileges if they hired an attorney. Second, they were told to remove all but four bunks from the station. Third, they received numerous reprimands for incidents not deserving of formal action. According to the defendants, it is undisputed that Carroll was reprimanded three times and given a written confirmation of warning one time during his six years with the department. Mayor Osborne rescinded all but one.[5] Burk was only reprimanded once following his claims in Jones. The reason, defendants contend, without dispute from Burk, is that he was ten hours late for his

---

[5]The court notes that if anyone was likely to be upset by Jones it would be Mayor Osborne.

shift. The Mayor rescinded the reprimand and Burk was not disciplined.

Based upon the recent case of <u>Wideman v. Wal-Mart Stores, Inc.</u>, __ F.3d __ (11th Cir. May 27, 1998), the court concludes that the evidence may be sufficient to prove adverse action.

As part of the constructive discharge claim, plaintiffs point to several actions that they contend amounted to an "intolerable" work environment, causing them to resign. To sustain an action for constructive discharge, the employee must prove that the conditions of employment were utterly intolerable. <u>Kilgore v. Thompson & Brock Management, Inc.</u>, 93 F.3d 752, 754 (11th Cir. 1996). Burk and Carroll allege that they were forced to take back to back calls while others were allowed to sleep. The chairs they usually slept in were wired shut. And they were forced to make calls with unlicensed drivers. The issue is close, but the court does not reach this issue.

2. Causal Connection.

The plaintiffs have offered little, if any, substantial evidence to support the proposition that the "but for" reason they were "retaliated" against was their involvement in the previous lawsuit. <u>Reich v. Davis</u>, 50 F.3d 962, 965 (11th Cir.

14

1995). In their response brief, plaintiffs point to nothing other than conclusory and subjective statements to show their treatment was causally related to the Jones suit. They suggest that the reason Burk and Carroll filed the numerous complaints against coworkers was because they were being constantly harassed in retaliation for Jones.

The fact that casts the most doubt on the causation argument is that the entire department benefitted from the original lawsuit. Plaintiffs, Patrick Parton, Bo Gortney, Jackie Jones, Michael Kaiser, Jeremy Thompson, Burk and Carroll settled with the City and were compensated. The other members of the department were compensated by the City in a separate settlement as a result of the suit. The overtime system was revamped to pay the medics for each hour over forty per week, regardless of whether that total reached 56. The court is unable to comprehend why a department full of employees would retaliate against two co-workers, out of five plaintiffs, for their involvement in a lawsuit, that from all indications, benefitted everyone involved.

Patrick Parton, a defendant in this suit, was a co-plaintiff in Jones. What possible reason would he have to retaliate against plaintiffs for their involvement in Jones? Defendants Lt. Marshall and Lt. Self enjoyed the benefit of the new overtime

policy as well as the fruits of the separate settlement. Why would they retaliate against two of the plaintiffs in the suit that made that possible?

If in fact the plaintiffs were being "picked on" or made to suffer from an unfriendly work environment, there must have been some reason besides Jones that caused it. Defendants suggest it might have been instigated by plaintiffs constantly filing complaints and grievances regarding the working conditions and conduct of their superiors as well as appeals outside of the chain of command. Plaintiffs own testimony indicates that they felt much of the harassment was due to reasons other than the prior lawsuit. Burk attributes his treatment to being discriminated against for personal reasons, because he was a single foster parent and suffering from "a medical condition." (Burk Depo. at 64-65, 192). He also states that he felt that they were just out to get him. Id. Carroll testified that he felt retaliation against him was borne out of his going "against the system...(Lieutenant Marshall's system)" (Carroll Depo. at 103, 163). Plaintiffs' Response Brief concedes that, "There were so many incidents of harassment and discrimination against the plaintiffs that it is possible that one or two of the incidents were caused by other reasons." (Pltf. Response at 15). They suggest there is still "ample evidence to suggest that Burk and

16

Carroll were singled out for their participation in the original FLSA suit and were the targets of a retaliatory campaign designed to force them to resign from service with the City." Their coworkers may have wanted them to resign, and that is not certain, but there is no reasonable inference that is was because of their participation in the FLSA suit. Neither logic nor evidence supports a theory of causation.

## IV. COURT'S CONCLUSION

The Court concludes that the City was plaintiffs' employer. The Mayor, the Chief, and the lieutenants were not employers under the terms of the FLSA. There is absolutely no reasonable inference evidence to support a causal connection between the alleged retaliation and the plaintiffs' involvement in Jones. Merely taking protected action does not immunize an employee against later employment action. There is no genuine issue of fact on this issue.

This 27th day of June, 1998.

/s/ Robert B. Propst
ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE